IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs February 11, 2015

## STATE OF TENNESSEE v. JAMES THOMAS, JR.

**Appeal from the Criminal Court for Davidson County**
**No. 2010A428      Monte Watkins, Judge**

_____

**No. M2014-00972-CCA-R3-CD – Filed July 23, 2015**

_____

Defendant, James Thomas, Jr., was indicted by the Davidson County Grand Jury for aggravated rape and domestic assault. A jury convicted Defendant as charged. The trial court sentenced Defendant to an effective sentence of 16 years and 6 months. In this appeal as of right, Defendant contends that: 1) the evidence was insufficient to support his conviction for aggravated rape because Defendant was not "armed with" a weapon; 2) the trial court erred by overruling defense counsel's objection to a detective's testimony regarding the victim's credibility; and 3) the prosecutor improperly commented on the victim's credibility. Having reviewed the briefs of the parties and the entire record in this case, we conclude that although the evidence is legally sufficient to support Defendant's convictions, the trial court should not have allowed the detective to testify regarding the victim's credibility, and the prosecutor's comments during closing argument constitute plain error. Accordingly, the judgment of the trial court is reversed and this case is remanded for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right;**
**Judgment of the Criminal Court Reversed and Remanded**

THOMAS T. WOODALL, P.J., delivered the opinion of the Court, in which ROBERT L. HOLLOWAY, JR. and TIMOTHY L. EASTER, JJ., joined.

Ryan K.H. Nevin, Nashville, Tennessee, (on appeal) and Robert Vaughn, Nashville, Tennessee, (at trial) for the Appellant, James Thomas, Jr.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Hugh Ammerman, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

*Facts*

The victim, M.B., testified that she began a relationship with Defendant in March, 2007. She testified that in May, 2009, Defendant was charged with domestic assault, and they were briefly separated. In October, 2009, they separated again. M.B. moved back into the residence with the understanding that they were no longer a romantic couple. M.B. slept in the bedroom, and Defendant slept on the couch. M.B. testified that she intended to find another residence at the end of January, 2010.

On December 23, 2009, Defendant sent M.B. a text message asking her to have sex with him. She testified that "it had been going on for at least a month." M.B. "would be in [her] bedroom, [and Defendant] would be on the couch. It would start right around bedtime. He started texting[.]" M.B. told Defendant to leave her alone. Defendant responded, "don't make me act a fool." M.B. went into the living room, and Defendant told her to pull down her pants. M.B. told Defendant that she did not want to have sex with him, and Defendant told her to lie down on the couch. M.B. testified that she "could tell [Defendant] was extremely irritated and very aggressive[,]" so she complied with his demands.

M.B. testified that Defendant had nonconsensual sexual intercourse with her on five occasions during the month of December. She testified that when she refused Defendant's request to have sex, "[i]t would be a fight. He would threaten to go wake up [her] kids. He would – it would be a constant nagging, a constant harassment, text messages all night long."

M.B. testified that on December 27, 2009, she was lying in bed, and Defendant got into bed with her and began rubbing her back. He told her to "give [him] some." M.B. refused, and Defendant left the room to retrieve a handgun from the closet. Defendant stood in the doorway of M.B.'s bedroom, "cradling" a "small double barrel handgun" in his hand. He told M.B. that he had two bullets, "one for [her] and one for him." After Defendant showed M.B. the handgun, he returned it to the closet and got into bed with her again "in a spooning position." Defendant had sexual intercourse with M.B. M.B. told Defendant that "he was sick, he needed help." M.B. testified that she knew that what had happened was "not right" because she told Defendant no, but she believed that rape involved "the tears and the rips and abusive attacks."

The following day, M.B. went to her doctor and was diagnosed with pneumonia. She did not mention to her doctor the incident with Defendant. That evening, she told Defendant that she was not feeling well. While she was preparing dinner for her

2

children, Defendant became angry because she had not prepared anything for his children to eat. Defendant said something about "putting his hands on [her], busting [her] face, something to that extent." Defendant poked M.B. in her eye. Defendant then "grabbed [her] by [her] lip, kind of jammed and pushed [her] down over the dishwasher." M.B.'s lip was swollen. On cross-examination, M.B. testified that she sought an order of protection following the incident, but she did not include in her statement the rape incident because she believed that the order of protection was only for domestic assault.

Officer Todd Christian, of the Metro Nashville Police Department, responded to a domestic disturbance call at the victim's and Defendant's residence. He testified that he noticed the dishwasher was open, but he did not observe any broken dishes or other disarray. Officer Christian spoke to the victim, and the victim gave him "a double barrel break action little pistol." The gun was kept in a shoe box in a hall closet. Based on the victim's statements to Officer Christian, he contacted detectives in the sex crimes unit.

Detective Heather Baltz, of the Metro Nashville Police Department's sex crimes unit, testified that she interviewed the victim. Detective Baltz testified that the victim was "generally very emotional throughout" the interview. At the conclusion of the interview, Detective Baltz "discussed the possibility of prosecuting for rape[,]" and the victim appeared to be "surprised."

Detective Baltz testified that "[o]ne of the primary functions of [her] job is to determine whether or not someone is credible and whether or not a crime was committed." Defense counsel objected, stating:

> [Defense counsel]: Objection, Your Honor. I believe this goes to a question of credibility. She's being asked about her credibility. She is not here to determine credibility but rather only to offer evidence in this case. She has not been introduced as an expert in this particular area.
>
> THE COURT: Well, it's getting – it's bordering on expert testimony, so I'll let her testify.

Detective Baltz continued,

> There are a lot of things I am trained to look for in determining whether or not it's a legitimate accusation. One of those things is victim credibility.
>
> Another is evidence. There's a lot of different factors that I look for in how I handle an investigation, whether or not it's legitimate.

3

And one of those things in talking to victims is whether or not their demeanor is such that they are credible.

Detective Baltz took photographs of several text messages on the victim's cell phone. There were text messages from Defendant to the victim on December 23, between 9:24 p.m. and 9:37 p.m. Defendant texted, "Can i have some 2 nite huh[?]" Defendant also texted, "I knw dat i guess i got 2 take it 2 nite and im nt playin[.]" Another text read "U up n here runnin up my bills and u can do nothin cant cook or nothin dats f[ ]k up u need 2 hurry up n get u some were 2 stay[.]" The victim's responses to Defendant's text messages were not available to Detective Baltz. Detective Baltz also took photographs of the victim's injuries. Detective Baltz testified that the victim's bottom lip "was swollen and red."

Detective Baltz also interviewed Defendant. A video recording of the interview was played for the jury. During the interview, Defendant stated that M.B. asked him to come into the bedroom and rub her back. He stated that he rubbed her back, and they had consensual sex. He stated that his and M.B.'s children were entering and leaving the bedroom while they had sex. He acknowledged that he sent text messages to M.B., but stated that he "was just playing with her." Defendant denied threatening M.B. with a gun. He stated that he kept his gun in the hall closet outside the bedroom. He denied stating to M.B. that he had one bullet for her and one bullet for himself. Defendant stated that on the night of the domestic assault incident, the victim became angry at him and hit him. He stated that he pushed her away, and he "mistakenly poked her in the eye." Defendant denied hitting M.B.'s lip.

Defendant testified at trial. He testified that he exchanged text messages with M.B. on the night of December 23, 2009. He was on the couch, and M.B. was in the bedroom. He testified that he did not have sex with M.B. that night. Later that night, Defendant went to his sister's house to visit his family members visiting from Mississippi. When he walked back to his house, M.B. and her children were not there.

Defendant testified that on the night of December 27, 2009, M.B. yelled for him to rub her back. Defendant went into the bedroom and began rubbing M.B.'s back. He testified that "one thing led to another[,]" and they began having sex. He testified that M.B. did not tell him "no" or tell him to stop. Defendant testified that he kept a gun in the closet. He denied that he retrieved the gun from the closet.

Defendant testified that on December 28, 2009, M.B. became angry during an argument and began throwing dishes. Defendant testified that he accidentally poked

4

M.B. in the eye. He apologized to her, and she hit him. Defendant testified, "[s]o I just pushed her and I walked out the door."

Defendant denied ever forcing M.B. to have sex with him. He denied ever threatening M.B. with his gun or making any threatening statements to her.

*Analysis*

*Sufficiency of the evidence*

Defendant contends that the evidence at trial was insufficient to prove that he was "armed with" a weapon, an essential element of aggravated rape. Although Defendant frames the issue as a jury instruction error, arguing that the trial court erred by instructing the jury as to the charge of aggravated rape (one of the charges for which he was indicted), Defendant's challenge is actually to the sufficiency of the convicting evidence.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight and value to be given the evidence are resolved by the fact finder. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978), *superseded on other grounds by* Tenn. R. Crim. P. 33 as stated in *State v. Moats*, 906 S.W.2d 431, 434 n.1 (Tenn. 1995). This court will not reweigh the evidence. *Id*. Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

Aggravated rape, as it would apply to the facts in this case, "is unlawful sexual penetration of a victim by the defendant . . . accompanied by any of the following circumstances: (1) Force or coercion is used to accomplish the act and the defendant is armed with a weapon . . . ." T.C.A. § 39-13-502(a)(1). "'Coercion' means threat of

5

kidnapping, extortion, force or violence to be performed immediately or in the future . . . ." *Id*. § 39-13-501(1). "'Force' means compulsion by the use of physical power or violence and shall be broadly construed to accomplish the purposes of this title." *Id*. § 39-11-106(a)(12).

The disputed issue in this case is whether Defendant was "armed with" a weapon during the incident. Defendant asserts that he was not in actual or constructive possession of the gun at the time of the rape because "the weapon was far removed from the activity." The State responds that although Defendant returned the gun to the closet outside of the victim's bedroom before he committed the act of rape, Defendant was in constructive possession of the gun because "[h]e could have quickly and easily retrieved the gun from the closet and again reduced it to his actual possession."

This court has concluded that the terms "armed with" and "in possession" are synonymous. *State v. Moore*, 703 S.W.2d 183, 186 (Tenn. Crim. App. 1985). Our courts have defined actual possession as knowingly having "direct physical control over a thing, at a given time." *State v. Edmondson*, 231 S.W.3d 925, 928 (Tenn. 2007) (citing *Black's Law Dictionary* 1163 (6th ed. 1990)). Constructive possession "requires that a defendant have 'the power and intention . . . to exercise dominion and control'" over the given item allegedly possessed. *State v. Robinson*, 400 S.W.3d 529, 534 (Tenn. 2013) (quoting *State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001)).

In order to resolve the issue in this case, we turn to principles of statutory construction. Our supreme court has stated:

> The most basic principle of statutory construction is to ascertain and give effect to legislative intent without broadening the statute beyond its intended scope. When statutory language is clear and unambiguous, we must apply its plain meaning in its normal and accepted use, without a forced interpretation that would extend the meaning of the language and, in that instance, we enforce the language without reference to the broader statutory intent, legislative history, or other sources.

*Carter v. Bell*, 279 S.W.3d 560, 564 (Tenn. 2009) (internal citations omitted); *see State v. Pope*, 427 S.W.3d 363, 367-68 (Tenn. 2013).

A plain reading of the statute reveals that the elements of aggravated rape, as charged in this case, are that: 1) the defendant sexually penetrated the victim; and 2) the defendant used force or coercion to accomplish the act and the defendant was armed with a weapon. We do not interpret the statute to require that a defendant be armed with a weapon *during* the unlawful sexual penetration, but rather we interpret the statute to

6

require that the defendant used force or coercion to accomplish the act of unlawful penetration and the defendant was armed with a weapon during at least part of the time force or coercion was used.

Viewed in the light most favorable to the State, the evidence at trial showed that Defendant went into the victim's bedroom, started rubbing her back, and demanded sex. The victim told Defendant to leave her alone. Defendant then left the room and retrieved a pistol from a closet. While "cradling the gun in his hand" and showing it to the victim, Defendant told the victim that he had a bullet for her and a bullet for himself. This frightened the victim and clearly was evidence of force or coercion used to accomplish the unlawful sexual penetration. Defendant then put the gun back inside the closet, returned to the bedroom, and sexually penetrated the victim.

The State relies upon *State v. Moore*, in which this court held that the defendant was in constructive possession of a gun that the defendant had placed on top of the refrigerator in his trailer after threatening the victim with it. The defendant then chained the victim to the defendant's bed and raped her. 703 S.W.2d at 185. Although Defendant attempts to distinguish *Moore* and argues that in this case, the gun was not in Defendant's immediate proximity, we find no distinction in the facts of both cases. In both cases, the weapons were outside of the immediate control of the defendants during the act of sexual penetration. In both cases, the defendants used weapons to threaten their victims immediately prior to the unlawful sexual penetration.

The jury in this case was entitled to conclude from evidence presented that Defendant sexually penetrated the victim and that he was armed with a weapon and used force or coercion to accomplish the act. Therefore, Defendant is not entitled to relief on this issue.

*Character evidence*

Defendant also contends that the trial court erred by allowing Detective Baltz to testify regarding the victim's credibility. The testimony about which Defendant complains is as follows:

> [Prosecutor]: Okay. In the course of your duties as a sex crimes detective do you come across – as the statement was made in jury selection – false accusations of rape?
>
> [Witness]: Absolutely.

7

[Prosecutor]: Okay, and what about this case distinguished it, if anything, from the cases that you've encountered where you felt pretty sure that you were dealing with a false accusation of rape?

[Witness]: One of the primary functions of my job is to determine whether or not someone is credible and whether or not a crime was committed.

[Defense counsel]: Objection, Your Honor. I believe this goes to a question of credibility. She's being asked about her credibility. She is not here to determine credibility but rather only to offer evidence in this case. She has not been introduced as an expert in this particular area.

THE COURT: Well, it's getting – it's bordering on expert testimony, so I'll let her testify.

[Prosecutor]: And if you would just – if you could explain the process – would you say that there is a significant percentage of cases that have been prosecuted based on your determination as a sex crime detective?

[Witness]: Yes, there are more cases that do not get prosecuted than do get prosecuted.

[Prosecutor]: Okay. Now, in this case as far as the actual use of the word 'rape', how did that play into – whenever it does – your determination about whether or not you're dealing with a legitimate accusation?

[Witness]: There are a lot of things I am trained to look for in determining whether or not it's a legitimate accusation. One of those things is victim credibility.

Another is evidence. There's a lot of different factors that I look for in how I handle an investigation, whether or not it's legitimate.

And one of those things in talking to victims is whether or not their demeanor is such that they are credible.

8

First, we note that the trial court's ruling that the witness's testimony was "bordering on expert testimony" is erroneous. Detective Baltz was not tendered as an expert witness. The trial court's ruling is silent on defense counsel's objection on the basis that the witness not be permitted to testify regarding the victim's credibility. Defendant argues on appeal that Detective Baltz's testimony was improper under Tennessee Rule of Evidence 608(a), which states:

> The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness, and (2) the evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked.

Defendant argues that Detective Baltz should not have been permitted to "bolster" the victim's credibility because the victim's credibility had not been attacked. The State concedes that Detective Baltz's testimony was inadmissible as character evidence under Rule 608(a); however, the State asserts that the testimony was admissible for another purpose. Tennessee Rule of Evidence 105 provides that "[w]hen evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court upon request shall restrict the evidence to its proper scope and instruct the jury accordingly." The State argues that the evidence was admissible not to bolster the victim's credibility, but rather to explain to the jury "that, as a general matter, it was central to her job to evaluate the evidence and a victim's demeanor to determine whether a crime had been committed." Defendant argues in his reply brief that the issue of whether a crime had been committed is a determination for the jury. We disagree with the State that the testimony was admissible for a legitimate other purpose. Whether or not a crime was committed and Defendant's guilt are legal determinations, and it is not the job of the State's lay witnesses to infringe upon the role of the jury as fact-finder. We reiterate that questions concerning the "'credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact.'" *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008)).

Having read the transcript, we find that although Detective Baltz did not directly comment on the victim's credibility, her testimony clearly implies that based upon Detective Baltz's determination that the victim was credible, Defendant should be convicted. We conclude that it was error for the trial court to allow this testimony.

Because the evidentiary error here is neither structural nor constitutional, our harmless error analysis is governed by Tennessee Rule of Appellate Procedure 36(b), which provides that "[a] final judgment from which relief is available and otherwise

9

appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." Our harmless error analysis "does not turn upon the existence of sufficient evidence to affirm a conviction or even a belief that the jury's verdict is correct. To the contrary, the crucial consideration is what impact the error may reasonably be taken to have had on the jury's decision-making." *State v. Rodriguez*, 254 S.W.3d 361, 372 (Tenn. 2008) (citations omitted).

There was no evidence presented in this case independent of the victim's testimony that an aggravated rape occurred. Because the jury's decision in this case was entirely a credibility determination between the victim and Defendant, we conclude that the erroneous admission of Detective Baltz's testimony regarding the victim's credibility more probably than not affected the outcome of the trial. Therefore, we must reverse Defendant's convictions and remand for a new trial.

*Prosecutorial misconduct*

Defendant also asserts that the prosecutor improperly used Detective Baltz's testimony during closing argument to express an opinion about the truthfulness of the victim's testimony and made other remarks improperly vouching for the victim's credibility. The State responds that Defendant has waived this issue by failing to make a contemporaneous objection. Defendant argues that because he objected contemporaneously to Detective Baltz's testimony regarding the victim's credibility, there was no need to renew his objection to the prosecutor's comments during closing argument in order to preserve the issue for appeal.

First, we agree with the State's assessment that Defendant's failure to object to several comments by the prosecutor during closing argument, about which Defendant complains, waives plenary review of this issue on appeal. *See* Tenn. R. App. P. 36(a) (providing that relief is not required for a party who failed to take reasonably available action to prevent or nullify an error); *State v. Little*, 854 S.W.2d 643, 651 (Tenn. Crim. App. 1992) (holding that the defendant's failure to object to the State's alleged misconduct during closing argument waives that issue). Defendant's argument that the prosecutor committed prosecutorial misconduct by making improper comments about the victim's credibility is a separate and distinct issue from the issue of whether Detective Baltz's testimony was improper. Thus, by failing to make a contemporaneous objection, Defendant has not properly preserved this issue, and he is not entitled to relief on appeal unless the prosecutor's remarks constitute "plain error."

Tennessee Rule of Appellate Procedure 36(b) provides that "[w]hen necessary to do substantial justice, [this] court may consider an error that has affected the substantial

rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." *See also* Tenn. R. Crim. P. 52(b); *State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000). In determining whether an alleged trial error constitutes "plain error," we consider five factors: 1) the record must clearly establish what occurred at trial; 2) a clear and unequivocal rule of law must have been breached; 3) a substantial right of the defendant must have been adversely affected; 4) the defendant did not waive the issue for tactical reasons; and 5) consideration of the error is "necessary to do substantial justice." *See State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994). Ultimately, the error must have "had an unfair prejudicial impact which undermined the fundamental fairness of the trial." *Id*. at 642.

Initially, we note that the record clearly establishes what occurred in the trial court. The parties' closing arguments are transcribed and included in the appellate record. The comments by the prosecutor that Defendant argues on appeal were improper are as follows:

(1) All right. I told you about false accusations of rape, because to deny it or make some type of statement taking the position that a false accusation of rape never happens would be so far from credible that I would hope you wouldn't believe anything else I had to say.

"Detective Baltz told you that more cases don't get charged than they do. What does that say about the ones that do?"

(2) "What has [Defendant] said that makes sense or has a ring of truth to it?"

(3) ". . . . that's why [the victim's] story had the ring of truth."

(4) "[T]he account that [the victim] gives is not a lie."

(5) The prosecutor commented that the victim was "telling the truth."

(6) Finally, the prosecutor commented, "[i]f [the victim]'s not telling the truth in that interview, then give her an academy award."

It is well-established that closing argument is an important tool for both parties during a trial; thus, counsel is generally given wide latitude during closing argument, and the trial court is granted wide discretion in controlling closing arguments. *See State v. Carruthers*, 35 S.W.3d 516, 577-78 (Tenn. 2000) (appendix). The basic purpose of closing argument is to clarify the issues that must be resolved in a case. *State v. Banks*,

271 S.W.3d 90, 130 (Tenn. 2008). "Notwithstanding such, arguments must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." *State v. Goltz*, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003). In *Goltz*, this court outlined "five general areas of prosecutorial misconduct" that can occur during closing argument:

> (1) intentionally misleading or misstating the evidence;
> (2) expressing a personal belief or opinion as to the truth or falsity of the evidence or defendant's guilt;
> (3) making statements calculated to inflame the passions or prejudices of the jury;
> (4) injecting broader issues than the guilt or innocence of the accused; and
> (5) intentionally referring to or arguing facts outside the record that are not matters of common public knowledge.

111 S.W.3d at 6.

"In determining whether statements made in closing argument constitute reversible error, it is necessary to determine whether the statements were improper and, if so, whether the impropriety affected the verdict." *State v. Pulliam*, 950 S.W.2d 360, 367 (Tenn. Crim. App. 1996). In connection with this issue, we must examine the following factors:

> (1) the conduct complained of viewed in context and in light of the facts and circumstances of the case[;]
> (2) the curative measures undertaken by the court and the prosecution[;]
> (3) the intent of the prosecutor in making the statement[;]
> (4) the cumulative effect of the improper conduct and any other errors in the record[; and]
> (5) the relative strength or weakness of the case.

*Id*. at 368 (quoting *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)).

The record in this case shows that the prosecutor made several comments expressing his personal belief regarding the truth of the victim's testimony and at least one statement expressing his personal belief that Defendant did not tell the truth. Referring to the list of statements by the prosecutor set forth above, in number (1), the implicit message is that Defendant would not have been charged without Detective Baltz's determination that the victim was a credible, truthful witness. In number (2), the prosecutor implicitly gives his opinion that Defendant's testimony is not true. In

12

numbers (3), (4), (5), and (6), the prosecutor is explicitly conveying his personal opinion that the victim testified truthfully. Therefore, we conclude that a clear and unequivocal rule of law was breached. Defendant clearly did not waive this issue for tactical reasons. As he asserts in his reply brief, he objected to Detective Baltz's testimony regarding the victim's credibility, and although he failed to object to the prosecutor's comments on the victim's credibility, he believes the trial court's ruling allowed the State to "use the fruits of [Detective Baltz's] testimony during [ ] closing argument and discuss the victim's creditability [sic] without objection." We also conclude that a substantial right of Defendant was adversely affected, consideration of the error is "necessary to do substantial justice[,]" and the error "had an unfair prejudicial impact which undermined the fundamental fairness of the trial." The victim's testimony was the linchpin of the prosecution against Defendant. Without any physical evidence supporting the victim's testimony, the determination of Defendant's guilt rested almost entirely on a determination of the victim's and Defendant's credibility. Therefore, the State's case against Defendant was not overwhelmingly strong.

Since Defendant did not object, neither the trial court nor the prosecution took any curative measures to abate the improper conduct. This weighs against Defendant. The prosecutor's remarks indicate that he intended to persuade the jury that the victim's testimony was truthful. Importantly, combined with the other error in the record, there is a cumulative effect of the improper conduct. Viewed in light of the facts and circumstances of the case, we believe that the prosecutor's comments are the basis for reversal in this case because "the conduct was so improper or the argument so inflammatory that it affected the verdict to [Defendant's] detriment." *See Goltz*, 111 S.W.3d at 5.

## CONCLUSION

In summary, although the evidence is legally sufficient to support Defendant's convictions, we conclude that the trial court erred by allowing Detective Baltz to testify regarding the victim's credibility. We further conclude that it was plain error for the prosecutor to express his personal belief of the victim's and Defendant's credibility during closing argument. Accordingly, Defendant's convictions are reversed, and this case is remanded for a new trial.

_____
THOMAS T. WOODALL, PRESIDING JUDGE

13